UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
ANASTASIA MYSKINA,                     :
                                       :
                    Plaintiff,         :   04 Civ. 6094 (MBM)
                                       :
          -against-                    :   OPINION AND ORDER
                                       :
THE CONDÉ NAST PUBLICATIONS, INC.,     :
GENTLEMAN'S QUARTERLY, MARK SELIGER,   :
and MARK SELIGER STUDIO,               :
                                       :
                    Defendants.        :
--------------------------------------X

APPEARANCES:

ALEXANDER BERKOVICH, ESQ.
(Attorney for Plaintiff Anastasia Myskina)
Berkovich and McMenamin
320 East 30th Street
New York, NY 10016
(917) 282-7752

DANIEL M. FELBER, ESQ.
(Attorney for Defendants Condé Nast Publications, Inc.,
Gentleman's Quarterly, Mark Seliger, and Mark Seliger Studio)
Balsam Felber & Goldfield
99 Wall Street
New York, NY 10005
(212) 422-4605

MICHAEL B. MUKASEY, U.S.D.J.

In this diversity action, plaintiff Anastasia Myskina sues defendants Condé Nast Publications, Inc. ("Condé Nast") and its magazine Gentleman's Quarterly ("GQ"),[1] Mark Seliger, and Mark Seliger Studio[2] for violations of Sections 50 and 51 of New York Civil Rights Law, misappropriation, unjust enrichment, negligence, and breach of contract. The claims arise out of the alleged unauthorized dissemination of photographs taken of Myskina by defendants in connection with the October 2002 "Sports" issue of GQ, and publication of these photographs in the July/August 2004 issue of the Russian magazine Medved. Defendants move to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) or alternatively, for summary judgment pursuant to Fed. R. Civ. P. 56. Because the parties have submitted affidavits and other exhibits, defendants' motion will be treated as one for summary judgment. See Fed. R. Civ. P. 12(b); see also Groden v. Random House, Inc., 61 F.3d 1045, 1052-53 (2d Cir. 1995). For the reasons set forth below, defendants' motion is granted.

---

[1]    Condé Nast and GQ collectively will be referred to as "Condé Nast."

[2]    Seliger and Seliger Studio collectively will be referred to as "Seliger."

1

Myskina, a Russian citizen, is the 2004 French Open champion who at the time of the filing of this complaint was ranked fourth among female professional tennis players worldwide. (Compl. ¶ 3; Defs.' Rule 56.1 Statement ¶ 3)  She was 20 years old at the time that the photographs at issue were taken.  Condé Nast is a New York publishing company; GQ is one of its publications (Compl. ¶ 4; Defs.' Rule 56.1 Statement ¶ 4) Seliger, who owns Seliger Studio, is a professional photographer who resides in New York.  (Compl. ¶ 6)

In July 2002, Condé Nast editor Beth Altschull contacted International Sports Advisors –- a publicity agency that represented Myskina at the time –- to inquire whether Myskina would be interested in being photographed in the nude by Seliger for the cover and interior of GQ's 2002 "Sports" issue as part of a pictorial and profile of female tennis players. (Affidavit of Beth Altschull ("Altschull Aff.") ¶ 3)  Myskina expressed interest, and her agent instructed Kenneth Gantman, a 23-year-old administrative assistant at International Sports Advisors, to set up the appointment and accompany Myskina to the photoshoot.  (Affidavit of Kenneth Gantman ("Gantman Aff.") ¶ 4) Altschull and Gantman spoke on several occasions before the date of the photoshoot to agree on a convenient date and time for Myskina to come to New York and participate in the photoshoot.

(Gantman Aff. ¶ 5)

On July 16, 2002, Myskina arrived at the photoshoot with Gantman and Jens Gerpach, who was her coach and then-boyfriend. (Altschull Aff. ¶ 7) Gantman claims that it was only at the photoshoot -- and not during previous conversations with Altschull -- that Altschull explained that the cover photograph of Myskina would depict her as "Lady Godiva" -- lying nude on the back of a horse. (Gantman Aff. ¶ 11) It is not clear from Altschull's affidavit whether she claims that this information was communicated before the date of the photoshoot. (Altschull Aff. ¶¶ 2, 3) In any event, Myskina expressed concern about being photographed in the nude. (Affidavit of Anastasia Myskina ("Myskina Aff.") ¶ 9) According to Myskina and Gantman, Altschull explained that Myskina would wear nude-colored underpants and have long hair taped to her body to cover her breasts and that, except for the Lady Godiva photographs to be published in the GQ issue, the photographs taken during the photoshoot would not be published anywhere. (Myskina Aff. ¶ 10; Gantman Aff. ¶ 13) Myskina claims that only after this assurance did she agree to be photographed. (Myskina Aff. ¶ 11; Gantman Aff. ¶ 14)

Before shooting began, Altschull presented Gantman with Condé Nast's standard release form ("Release") for models appearing in Condé Nast publications and informed him that absent

his objection, she would ask Myskina to sign it.  (Exs. A and B
to Altschull Aff.; Altschull Aff. ¶¶ 6-7)  The Release, which is
printed on Condé Nast letterhead, provides that the signatory
model "hereby irrevocably consent[s] to the use of [her] name and
the pictures taken of [her] on [a specified date] by [Condé
Nast], . . . and others it may authorize, for editorial
purposes."  (Exs. A and B to Altschull Aff.)  The Release does
not contain a merger clause.  (Id.)  Myskina's signature appears
on the Release.  (Ex. B to Altschull Aff.)

Myskina claims that Gantman was neither an agent nor a
publicist at International Sports Advisors and did not represent
himself as such to Altschull, anyone at GQ, or anyone at the
studio where the photoshoot took place.  (Myskina Rule 56.1
Statement ¶ 8; Gantman Aff. ¶ 3)  Defendants claim that Gantman
voiced no objection to the Release or to Myskina's signing it.
(Altschull Aff. ¶ 7)  In addition to denying that he was ever
presented with the Release, Gantman claims that he neither
discussed the Release with Myskina nor observed her signing it.
(Gantman Aff. ¶¶ 16-17)  Myskina does not recall signing or
discussing a Release with Condé Nast.  (Myskina Rule 56.1
Statement ¶ 14)  Moreover, Myskina claims that she could not have
understood the terms of the Release (id. ¶ 18) because at the
time she was not fluent in English (Myskina Aff. ¶ 2) and "would
not have signed [the Release] had it been explained to her that

4

[it] would or might authorize GQ and Mark Seliger to publish, sell or disseminate her photographs from [the photoshoot] beyond publication of the Lady Godiva photograph for the 2002 'Sports Issue' of GQ."  (Myskina Rule 56.1 Statement ¶¶ 18-19)

Myskina claims that she was photographed topless in blue jeans after Seliger finished with the Lady Godiva photographs and that these had "nothing to do with the 'Lady Godiva' concept."  (Myskina Rule 56.1 Statement ¶¶ 20-22)  She recalls that Seliger asked her whether he could take these topless photographs "for himself" so long as they were already in the studio.  (Myskina Rule 56.1 Statement ¶ 22; Myskina Aff. ¶ 20)  She "told him he could only take these photographs if these photographs would not be published anywhere," to which he "understood and agreed."  (Myskina Aff. ¶ 20)

Condé Nast eventually published Myskina's profile and a "Lady Godiva" photograph from the photoshoot, which appeared on both the issue's cover and in a two-page spread inside the issue. (Ex. C to Altschull Aff.)  Myskina was not paid in connection with the publication of her photograph in GQ.  (Myskina Aff. ¶ 4)

Pursuant to an agreement that went into force on February 20, 2002 ("Seliger Agreement"), Seliger is authorized by Condé Nast to exploit all photographs taken on assignment by Condé Nast for various uses, subject to certain restrictions, including an "exclusivity period" during which Condé Nast

possesses the exclusive first right to publish photographs taken by Seliger on assignment for Condé Nast. (Affidavit of Linda Rice ("Rice Aff.) ¶ 4) The exclusivity period for the July 16, 2002 photographs of Myskina expired on November 23, 2003, after which Seliger had the right to authorize publication of the photographs for "editorial syndication". (Id. ¶¶ 5, 8; Seliger Agreement at 8) Seliger could authorize publication for "any commercial, merchandising or advertising purpose" only with Condé Nast's express written consent. (Seliger Agreement at 8)

On February 13, March 7, and March 20, 2004, Corbis Corporation ("Corbis"), a photograph and fine art image licensing company, received images from the July 16, 2002 photoshoot from Seliger and placed them on the Corbis website. (Defs.' Rule 56.1 Statement ¶ 15) Corbis was Seliger's exclusive agent for the syndication of his photographs for editorial purposes. (Defs.' Rule 56.1 Statement ¶ 13; Affidavit of William Hannigan ("Hannigan Aff.") ¶ 6) Around June 9, 2004, Corbis, through its authorized agent in Russia, licensed five of the July 16, 2002 photoshoot images to Medved. (Id. ¶ 16)

In July 2004, these photographs appeared in the July/August 2004 issue of Medved (Compl. ¶ 15; Ex. B to Declaration of Alexander Berkovich ("Berkovich Decl.")), and soon after on Medved's website. (Myskina Aff. ¶ 21; Ex. C to Berkovich Decl.) One of the photographs was published on the

issue's cover, and the other four appeared inside. (Ex. B to Berkovich Decl.) Three, including the cover shot, depict frontal nudity and two appear to be versions of the Lady Godiva photograph that appeared in the October 2002 GQ issue. (Id.)

Meanwhile, Medved had approached Myskina after her French Open win about an interview and photography session. (Myskina Aff. ¶ 17) She "told them that [she] couldn't do it." (Id.) However, it appears that she granted the interview but not the photoshoot. (Ex. B to Affidavit of Robert Balsam ("Balsam Aff.") Medved represented to her that it would use an "on the court" action photograph of her by a Russian sports photographer. (Id.)

The Medved article, entitled "Nastya Myskina: The Champion's Private Life," included a biography of Myskina and excerpts from the interview, which covered her thoughts on her French Open win, press reports of her romantic life, and life on the professional tennis tour. (Ex. A to Balsam Aff.)

According to Myskina, Medved never notified her that it had acquired and intended to publish photographs taken of her by Seliger during the July 16, 2002 photoshoot. (Myskina Aff. ¶ 17)

Myskina claims that the publication of the photographs in Medved "are highly embarrassing and have caused [her] great emotional distress and economic harm and injury to her reputation." (Compl. ¶ 20) She also claims that Seliger has sold

the same photographs to other parties.  (Compl. ¶ 21)

Myskina filed the instant complaint on August 5, 2004. She sues for compensatory and exemplary damages as well as injunctive relief restraining the sale and dissemination of the photographs at issue.

II.

Section 50 of New York Civil Rights Law provides:

> A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, . . . is guilty of a misdemeanor.

N.Y. Civ. Rights L. § 50.  Section 51 provides:

> Any person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state . . . .

Id. § 51.  The statutes apply to "cases where the plaintiff generally seeks publicity . . . but has not given written consent for a particular use" or where "the defendant has otherwise exceeded the limitations of the consent."  Stephano v. News Group Publ'ns, Inc., 64 N.Y.2d 174, 183, 485 N.Y.S.2d 220 (1984). Although plaintiffs suing under Sections 50 and 51 often couch their claims in a right to privacy, "[t]he right which the statute permits the plaintiff to vindicate [in such

8

circumstances] may, perhaps, more accurately be described as a right of publicity." Id.

In any event, defendants argue with respect to Myskina's claims under Sections 50 and 51 (i) that Myskina consented in writing to the unrestricted editorial use of the photographs taken during the July 16, 2002 photoshoot, including the ones that appeared in Medved; (ii) that the publication of the photographs in Medved fall within the "newsworthiness" or "public interest" exception to Sections 50 and 51; and (iii) that the photographs' appearance in Medved does not constitute a use "within this State".

Myskina contends that the Release was not "knowingly or intelligently signed, that she could not in any event understand its meaning," and that regardless, "defendants agreed with [] Myskina to limit publication to [the] 'Lady Godiva' photograph" in the October 2002 issue of GQ. (Myskina Opp'n at 6)

Myskina claims also that she never discussed the Release with Altschull or Gantman and that she does not recall signing the Release. (Myskina Aff. ¶ 14) However, she admits that the signature that appears on the Release is hers and does not otherwise deny that she actually signed the Release. (Id.) Regardless, in order to raise a genuine issue of material fact as to whether she actually signed the Release, it is not enough for Myskina simply to aver, in conclusory fashion, that she does not

recall signing the Release.  See Manning v. Energy Conversion Devices, Inc., 833 F.2d 1096, 1103 (2d Cir. 1987); Dassero v. Edwards, 190 F. Supp.2d 544, 555 (W.D.N.Y. 2002).

According to Myskina, Altschull assured her and Gantman "that the only photographs of [her] that would ever be published would be the Lady Godiva photographs in the October 2002 sports issue of GQ."  (Myskina Aff. ¶ 11)  Gantman states the same. (Gantman Aff. ¶ 14)  Myskina claims also that the other photographs that appeared in Medved were taken after the Lady Godiva photographs, and only upon Seliger's request to "take [them] for himself since [they] were already in the photo studio."  (Myskina Aff. ¶ 20) "He indicated that he understood and agreed" with Myskina's condition that these photographs could not be published anywhere.  (Id.)  None of these understanding and agreements were put in writing.

Absent allegations of fraud, duress, or some other wrongdoing, Myskina's claimed misunderstanding of the Release's terms does not excuse her from being bound on the contract.  See Feinblum v. Liberty Mut. Ins. Co., No. 02-5085, 2003 WL 21673620, at*2 (S.D.N.Y. July 16, 2003) ("[W]hen a party to a written contract accepts it as a contract he is bound by the stipulations and conditions expressed in it whether he reads them or not. Ignorance through negligence or inexcusable trustfulness will not relieve a party from his contract obligations.") (quoting Metzger

v. <u>Aetna Ins. Co.</u>, 227 N.Y. 411, 416, 125 N.E. 814, 816 (1920));
<u>see also</u> <u>Gaskin</u> v. <u>Stumm Handel GmbH</u>, 390 F. Supp. 361, 366
(S.D.N.Y. 1975).  Nor can she avoid her obligations under the
Release because of her purported failure to read its contents,
<u>see</u> <u>Romero</u> v. <u>Khanijou</u>, 212 A.D.2d 769, 623 N.Y.S.2d 262 (2d
Dep't 1995) ("A party who signs a document without any valid
excuse for having failed to read it is 'conclusively bound' by
its term.") (quoting <u>Sofio</u> v. <u>Hughes</u>, 162 A.D.2d 518, 556
N.Y.S.2d 717 (2d Dep't 1990)), or because of a language barrier.
<u>See</u> <u>Holcomb</u> v. <u>TWR Express, Inc.</u>, 11 A.D.3d 513, 782 N.Y.S. 840
(2d Dep't 2004) ("A person who is illiterate in the English
language is not automatically excused from complying with the
terms of a contract simply because he or she could not read
it."); <u>Maines Paper and Food Serv., Inc.</u> v. <u>Adel</u>, 256 A.D.2d 760,
761, 681 N.Y.S.2d 390, 391 (3d Dep't 1998).

As for the oral agreement that Myskina claims limited
her consent to publication only of the GQ photographs, the parol
evidence rule bars the admission of any prior or contemporaneous
negotiations or agreements offered to contradict or modify the
terms of a written agreement.  <u>See</u> <u>Wallace Steel, Inc.</u> v.
<u>Ingersoll-Rand Co.</u>, 739 F.2d 112, 115 (2d Cir. 1984); <u>Marine
Midland Bank-Southern</u> v. <u>Thurlow</u>, 53 N.Y.2d 381, 387, 442
N.Y.S.2d 417, 419-20 (1981).  Even where an agreement is not
completely integrated  –– meaning that the writing was intended

by the parties to be a final and complete expression of all the terms agreed upon -- parol evidence may be admitted only to complete the agreement or to resolve some ambiguity therein, and not to vary or contradict its contents. _See_ Restatement (Second) of Contracts § 215 (1981) ("[W]here there is a binding agreement, either completely or partially integrated, evidence of prior or contemporaneous agreements or negotiations is not admissible in evidence to contradict a term of the writing"); _Rothberg_ v. _Bernstein_, No. 87-2053, 1990 WL 58902, at *4 (S.D.N.Y. Apr. 30, 1990); _Laskey_ v. _Rubel Corp._, 303 N.Y. 69, 71-72, 100 N.E.2d 140 (1951); _South Road Assocs., LLC_ v. _Int'l Bus. Machs. Corp._, 2 A.D.3d 829, 831, 770 N.Y.S.2d 126, 128 (2d Dep't 2003); _In re Ajar_, 237 A.D.2d 597, 600, 655 N.Y.S.2d 608, 610 (2d Dep't 1997).

Application of the parol evidence rule involves a three-step inquiry: (i) determine whether the written contract is an integrated agreement; if it is, (ii) determine whether the language of the written contract is clear or is ambiguous; and, (iii) if the language is clear, apply that clear language. _See Morgan Stanley High Yield Sec., Inc._ v. _Seven Circle Gaming Corp._, 269 F. Supp.2d 206, 213 (citing _Investors Ins. Co._ v. _Dorinco Reinsurance, Co._, 917 F.2d 100, 103-05 (2d Cir. 1990)).

Absent a merger clause or language that explicitly states that the written agreement is integrated, the issue of whether the writing is an integrated agreement is determined "by

reading the writing in the light of surrounding circumstances, and by determining whether or not the agreement was one which the parties would ordinarily be expected to embody in the writing." Wilson-Gray v. Jay Feinberg, Ltd., No. 90-0001, 1990 WL 209635, at *2 (S.D.N.Y. Dec. 17, 1990) (quoting Braten v. Bankers Trust Co., 60 N.Y.2d 155, 162, 468 N.Y.S.2d 861, 864 (1983)) (internal quotation marks and citation omitted); Starter Corp. v. Converse, Inc., 170 F.3d 286, 295 (2d Cir. 1999).

Several factors indicate that the Release is an integrated agreement as to which photographs Myskina authorized the defendants to use for editorial purposes. The Release does not mention the alleged oral agreement –- or any other agreement outside the Release, for that matter –- that would limit Myskina's consent to the GQ photographs. Further, it addresses a straightforward transaction and plainly sets forth that Myskina consented to defendants' use of all photographs taken on July 16, 2002. Although the Release does not contain an explicit merger or integration clause, its language ("I, the undersigned, hereby irrevocably consent . . . .") indicates an intention to treat the issue of consent comprehensively and to be bound only by the terms of the Release. See Adler & Shaykin v. Wachner, 721 F. Supp. 472, 476-77 (S.D.N.Y. 1988) (enumerating the factors New York courts consider in determining whether there is an integration).

Moreover, the purported oral agreement contemplates a condition fundamental to Myskina's consent, such that it hardly would have been omitted by the parties. See Wilson-Gray, 1990 WL 209635, at *2 (citing Braten, 60 N.Y.2d at 163). Also, however unwise it may have been to bring only an administrative assistant from the publicity firm to the photoshoot, there appears to be no dispute that Myskina was still represented by the firm throughout the process. Under these circumstances, the Release constitutes a fully integrated contract as to Myskina's consent. See, e.g., Wilson-Gray, 1990 WL 209635, at *2-3; Adler & Shaykin, 721 F. Supp. at 476-77.

The purported oral agreement contradicts the plain language of the Release. Under the alleged oral agreement, Myskina consented only to the publication of the photographs in the October 2002 issue of GQ. By contrast, under the Release, Myskina expressly consented to the "use . . . for editorial purposes" by defendants of all photographs taken of her on July 16, 2002. Hence, the Release and the oral agreement are inconsistent in that the Release does not single out or otherwise limit which photographs taken during the July 16, 2002 photoshoot could be used for editorial purposes. Hence, the oral agreement is not admissible.

Although the Release is plainly integrated, evidence of an extrinsic oral agreement to limit Myskina's consent

nevertheless could be considered if it satisfies three
conditions: "(1) the agreement must in form be a collateral one;
(2) it must not contradict express or implied provisions of the
written contract; (3) it must be one that parties would not
ordinarily be expected to embody in the writing. . . . It must
not be so clearly connected with the principal transaction as to
be part and parcel of it." Namad v. Solomon, 147 A.D.2d 385,
387, 537 N.Y.S.2d 807 (quoting Mitchill v. Lath, 247 N.Y. 377,
381, 160 N.E. 646, 647 (1928)). However, the alleged oral
agreement in this case fails to satisfy any of the three
conditions. It is not "collateral," but central to the parties'
agreement as to Myskina's consent. It contradicts directly the
plain language of the Release. Finally, its central provision --
restriction of publication -- was Myskina's main, if not only
condition of participating in the photoshoot, and is a matter
that the parties would have been expected to memorialize in
writing. See, e.g., Wilson-Gray, 1990 WL 209635, at *3-4.
Hence, "[f]ailure to include it in the written contract bars
proof of its existence." Gulf Int'l Bank B.S.C., New York Branch
v. Othman, No. 93-3161, 1994 WL 116015, at *6 (S.D.N.Y. Mar. 28,
1994) (citing Mitchell, 247 N.Y. at 380).

        Myskina argues with respect to her statutory claims
that even if evidence of the alleged oral agreement is not
admissible, defendants have failed to demonstrate that the

                                15

photographs were used for "editorial purposes" pursuant to the
Release. The Release limits use of the photographs to Condé
Nast, its affiliates, and other parties authorized by Condé Nast.
(Ex. B to Altschull Aff.) Their use is restricted to "editorial
purposes." (Id.) Myskina argues that although the Release might
have permitted Condé Nast itself to publish the photographs in
question, the Release does not allow Condé Nast or Seliger, as a
party authorized to make use of the photographs, to sell the
photographs to a third party, regardless of whether that party
uses the photographs for editorial purposes.

Myskina further claims that the Seliger Agreement does
not restrict use of the photographs to "editorial purposes" as
the Release does. Myskina relies on the affidavit of Condé Nast
Vice-President Linda Rice, who averred that "[o]nce the
applicable exclusivity period has expired, Seliger is authorized
to cause the photographs to be published for various purposes,
including editorial use." (Rice Aff. ¶ 5) She argues that
defendants have not demonstrated that the photographs were used
for editorial purposes but rather, that "the photographs were
simply sold by Seliger as a commodity." (Myskina Opp'n at 22)

Myskina's reading of the Seliger Agreement is not
entirely accurate. The Agreement forbids Seliger from
authorizing the photographs to be published for "commercial,
merchandising or advertising purpose[s], . . . whether or not

Condé Nast's period of exclusivity has passed and/or this Agreement has expired or been terminated" unless Seliger "first obtains Condé Nast's express written consent."  (Seliger Agreement at 8)  However, the "limitation does not apply to editorial syndication."  (Id.)

As to whether the Release forbids Condé Nast and Seliger from selling the photographs to other parties, defendants contend that such an interpretation "impermissibly expands the definition of the term 'use'" for purposes of Sections 50 and 51. (Defs.' Reply at 11)  They argue that the "'use' of plaintiff's photographs occurred at the time the photographs were published and not at the time they were sold to Medved."  (Id. at 12)

Both parties appear to confuse permissible uses of the photographs under the Release with permissible uses of the photographs under Sections 50 and 51.  Regardless, Seliger's syndication of the photographs to Medved through Corbis is not actionable under the statutes.

In interpreting the terms "advertising" and "trade" in Sections 50 and 51, courts have limited their application where publications treat newsworthy subjects or matters of public interest.  See Lerman v. Flynt Distrib. Co., 745 F.2d 123, 130 (2d Cir. 1984); Stephano, 64 N.Y.2d at 184-85.  "Newsworthiness" and "public interest" in this context have been construed "in most liberal and far-reaching terms" to encompass "all types of

factual, educational and historical data, or even entertainment
and amusement, concerning interesting phases of human activity in
general." Psihoyos v. Nat'l Examiner, No. 97-7624, 1998 WL
336655, at *6 (S.D.N.Y. June 22, 1998) (citing DeGregorio v. CBS,
Inc., 123 Misc.2d 491, 493, 473 N.Y.S.2d 922, 924 (N.Y. Sup. Ct.
1984)). "The exception reflects Federal and State constitutional
concerns for free dissemination of news and other matters of
interest to the public . . . but essentially requires an
interpretation of the statute to give effect to the legislative
intent" of safeguarding people against commercial
misappropriations of their likenesses. Stephano, 64 N.Y.2d at
184 (internal citations omitted).

Accordingly, New York courts have adopted a deferential
standard of review in evaluating the media's editorial judgments
for purposes of Sections 50 and 51. As "questions of
newsworthiness are better left to reasonable editorial judgment
and discretion . . . judicial intervention should occur only in
those instances where there is no real relationship between a
photograph and an article or where the article is an
advertisement in disguise." Finger v. Omni Publ'ns Int'l, 77
N.Y.2d 138, 143, 564 N.Y.S.2d 1014 (1990); see also Howell v. New
York Post, 81 N.Y.2d 115, 124, 596 N.Y.S.2d 350, 355 (1993).

Under New York law, "[i]f a sale of a photograph for
profit, which otherwise would be for trade purposes, is used in

'reasonable connection' with the publication of a 'matter of public interest,'" both the sale and the subsequent "use" of the photograph are "privileged and constitute[] constitutionally protected free speech" and hence fall under the newsworthiness and public interest exceptions to Sections 50 and 51. <u>Barrows</u> v. <u>Rozansky</u>, 111 A.D.2d 105, 108, 489 N.Y.S. 481, 485 (1st Dep't 1985) (quoting <u>Davis</u> v. <u>High Society Magazine</u>, 90 A.D.2d 374, 381, 457 N.Y.S.2d 308 (2d Dep't 1982)); <u>see also</u> <u>Costlow</u> v. <u>Cusimano</u>, 34 A.D.2d 196, 197-98, 311 N.Y.S.2d 92, 93-94 (4th Dep't 1970) (holding that photographer's presentation "for profit" of photograph was insufficient basis for Sections 50 and 51 claims where subject matter of photograph and accompanying article were within "the area of legitimate public interest"). Put another way, where "a plaintiff's picture is used to illustrate an article on a matter of public interest [or newsworthiness], there can be no liability under sections 50 and 51 unless the picture has no real relationship to the article or the article is an advertisement in disguise." <u>Messenger ex rel. Messenger</u> v. <u>Gruner + Jahr Printing and Publ'g</u>, 94 N.Y.2d 436, 442, 706 N.Y.S.2d 52, 56 (2000) (internal citations omitted). That has been the case even where a plaintiff's photograph, "when juxtaposed with an article, could reasonably have been viewed as falsifying or fictionalizing plaintiff's relation to the article." <u>Id.</u> at 443; <u>see also</u> <u>Finger</u> v. <u>Omni Publ'ns Int'l</u>, 77

N.Y.2d 138, 142-45, 564 N.Y.S.2d 1014 (1990) ("real relationship" between photograph of plaintiff's family and article on caffeine-aided in vitro fertilization, even where none of plaintiff's children had been conceived by in vitro fertilization and plaintiff had not participated in caffeine-aided fertility project).

That a publication is produced for profit or even that "a publication may have used a person's name or likeness 'solely or primarily to increase the circulation' of a newsworthy article -- and thus increase profits -- does not mean that the name or likeness has been used for trade purposes within the meaning of" Sections 50 and 51. <u>Messenger</u>, 94 N.Y.2d at 442 (quoting <u>Stephano</u>, 64 N.Y.2d at 184-85). "A contrary rule would unreasonably and unrealistically limit the exception to nonprofit or purely altruistic organizations which are not the only, or even the primary, source of information concerning newsworthy events and matters of public interest." <u>Stephano</u>, 64 N.Y.2d at 85; <u>see also</u> <u>Arrington</u> v. <u>New York Times</u>, 55 N.Y.2d 433, 440, 449 N.Y.S.2d 941, 943 (1982). Hence, the issue boils down to whether (i) the Medved article was "newsworthy" or involved matters of "public interest"; and (ii) whether the photographs bore "a reasonable connection" to that article.

Myskina gives short shrift to the former question, perhaps recognizing the breadth of the newsworthiness and public

interest exceptions to Sections 50 and 51.  Medved published the
article and photographs within one month of Myskina's French Open
victory.  It hardly can be argued that an article about the
victory itself, Myskina's impressions of women's professional
tennis, and accounts of her romantic life is not newsworthy or
does not involve matters of public interest, as liberally as
those terms are construed when applying Sections 50 and 51.
Indeed, Myskina herself recognizes that Medved bought the
photographs and published the article in the immediate aftermath
of her "newly acquired status as one of the top female tennis
players in [the] world and her recent success in winning a Grand
Slam tournament. . . ."  (Myskina Opp'n at 5)

As for the photographs, they are newsworthy on their
own as well as in connection with the article.  See Davis v. High
Soc'y Magazine, 90 A.D.2d 374, 383, 457 N.Y.S.2d 308 (2d Dep't
1982) (stating that had plaintiff, "a well-known female boxer,
posed nude in a boxing scene or actually posed in a semiclad
fashion . . . publication of a picture showing her thus would be
absolutely protected").  It cannot be said that the photographs
bear "no real relationship" to the article, given that Myskina is
its subject.  (Ex. A to Balsam Aff.)  Myskina asserts only that
Seliger sold the photographs to Medved "as a simple matter of
trade, profit and commerce."  (Myskina Opp'n at 25; Myskina Rule
56.1 Statement ¶ 40)  Without more, such conclusory statements

are insufficient to defeat a motion for summary judgment.  See
Gottlieb v. County of Orange, 84 F.3d 511, 518 (2d Cir. 1996)
(summary judgment cannot be defeated by "rel[iance] on the
allegations in [complaint], . . . or on conclusory statements").
That Myskina "does not like either the manner in which she is
portrayed . . . or the medium in which her picture is reproduced
and her belief that such reproduction has caused her
embarrassment, . . . do[es] not expand her rights or create any
cause of action under Section 51 of the Civil Rights Law."  Ann-
Margret v. High Soc'y Magazine, Inc., 498 F. Supp. 401, 405-06
(S.D.N.Y. 1980).  Hence, Seliger's syndication of the photographs
to Medved was not a violation of Sections 50 and 51.

        Accordingly, summary judgment is granted as to
Myskina's statutory claims.


                            III.

        As for her breach of contract claim, Myskina alleges
that because Condé Nast "agreed with [her] that a photograph
selected from the Photoshoot for the GQ October 2002 issue would
be the only photographs that would be published,  . . . Condé
Nast . . . materially breached [the] Agreement by failing to
prevent photographs from the Photoshoot to be published in other
publications, including Medved."  (Compl. ¶¶ 59-62)  As discussed
above, the Release defeats such a claim.

                            22

In her brief opposing summary judgment, Myskina also appears to argue –- through a simple conclusory allegation that Seliger sold the photographs "as a commodity" –- that both Condé Nast and Seliger breached the Release itself because Seliger, as a party authorized by Condé Nast under the Release to "use" the photographs, did not provide the photographs to Medved for "editorial purposes." (Myskina Opp'n at 21-22) To reiterate, the Seliger Agreement allows Seliger –- after the expiration of Condé Nast's exclusivity period –- to authorize editorial syndication of the photographs; in contrast, any use of the photographs for commercial, merchandising, or advertising purposes could not be authorized by Seliger without Condé Nast's written consent. (Seliger Agreement at 8) Corbis is Seliger's exclusive agent for the syndication of his work "for editorial use only." (Hannigan Aff. ¶ 6) Finally, the photographs were provided to Medved not to be put in an advertisement, but to accompany an article about Myskina, her recent French Open victory, and other matters of public interest. In short, Myskina offers nothing to create an issue of material fact as to whether the photographs were provided to Medved for editorial purposes. See Gottlieb, 84 F.3d at 518.

As for Myskina's other common law claims, it is settled that the only judicially recognized relief in New York for violations of a right to privacy or publicity are the protections

23

afforded against the commercial misappropriation of a person's name or picture, as set forth in Sections 50 and 51.  There is no independent common law cause of action in the right to privacy or publicity.  See e.g., Pirone v. MacMillan, Inc., 894 F.2d 579, 586 (2d Cir. 1990) ("New York courts have indicated clearly that the Civil Rights Law preempts any common law right of publicity action. . . ."); Arrington, 55 N.Y.2d at 439; Grodin v. Cable, 244 A.D.2d 153, 154, 664 N.Y.S.2d 276 (1st Dep't 1997) (holding that "it was error not to dismiss plaintiff's causes of action for negligence and unjust enrichment, there being no common-law right of privacy in New York" where the plaintiff brought an action to recover damages for the unauthorized reuse of his image and voice in a television commercial).

Under New York law, common law unjust enrichment claims for unauthorized use of an image or likeness are subsumed by Sections 50 and 51.  See, e.g., Zoll v. Jordache Enter., Inc., No. 01-1339, 2002 WL 31873461, at *16 (S.D.N.Y. Dec. 24, 2002); Allen v. Men's World Outlet, Inc., 679 F. Supp. 360, 365 (S.D.N.Y. 1988); Hampton v. Guare, 195 A.D.2d 366, 600 N.Y.S.2d 57, 58-9 (1st Dep't 1993).  Likewise, New York law does not recognize common law misappropriation and negligence claims based on the same allegations.  See, e.g., Knight-McConnell v. Cummins, No. 03-5035, 2004 WL 1713824, at *3 n.6 (S.D.N.Y. July 29, 2004); Arrington, 55 N.Y.2d at 439; Grodin, 244 A.D.2d at 154.

Accordingly, Myskina's unjust enrichment, misappropriation, and negligence claims, which are based on the alleged unauthorized use of her likeness and share the factual allegations of the statutory claims, are dismissed.

In a footnote in her opposition brief, Myskina requests leave to amend her complaint to add a breach of contract claim against Seliger based on the same purported oral agreement underlying her breach of contract claim against Condé Nast –– that none of the photographs taken during the photoshoot would be published except in the October 2002 GQ issue. (Myskina Opp'n at 23 n.4; Myskina Aff. ¶¶ 12, 13, 16, 20)

Where an amended complaint is proposed in response to a summary judgment motion, "the court may deny the amendment as futile when the evidence in support of the plaintiff's proposed new claim creates no triable issue of fact and the defendant would be entitled to judgment as a matter of law under Fed. R. Civ. P. 56(c))." Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001). Here, the proposed additional claim against Seliger fails for the same reasons that the breach of contract claim against Condé Nast fails. Defendants have established that the Release is a fully integrated agreement that sets forth Myskina's consent to defendants' use for editorial purposes of all photographs taken of her during the July 16, 2002 photoshoot. The oral representations relied on by Myskina in her proposed

claim -- which are no different from the ones relied on in her other claims -- directly contradict the plain language of the Release. Accordingly, Myskina's request to amend her complaint is denied.

$$* \qquad\qquad * \qquad\qquad *$$

For the reasons set forth above, defendants' motion for summary judgment is granted.

SO ORDERED:

Dated:    New York, New York
        July 12, 2005

Michael B. Mukasey
U.S. District Judge